# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 20, 2005 Session

## STATE OF TENNESSEE v. BOBBY W. JENKINS
## and TAREAUN D. GRIFFIN

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-B-1279     Cheryl Blackburn, Judge**

---

**No. M2005-00593-CCA-R3-CD - Filed March 13, 2006**

---

This is a direct appeal as of right by Defendant Tareaun D. Griffin from convictions entered on a jury verdict of especially aggravated robbery and attempted second degree murder, and an appeal by Defendant Bobby Wayne Jenkins from his conviction entered on a jury verdict of especially aggravated robbery. Defendant Jenkins was sentenced to twenty years for his especially aggravated robbery conviction. Defendant Griffin was sentenced to twenty years for his especially aggravated robbery conviction and eleven years for his attempted second degree murder conviction, with the sentences to run consecutively for an effective thirty-one year sentence. On appeal, Defendant Griffin raises two issues: (1) the trial court erred in failing to charge the jury with instructions on self-defense, and (2) the court erred in imposing consecutive sentencing. Defendant Jenkins raises two separate issues: (1) the trial court erred in excluding the testimony of an expert witness, and (2) the court erred in failing to impose a mitigated sentence. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Brent Horst, Nashville, Tennessee, for the appellant, Bobby W. Jenkins.
David Collins, Nashville, Tennessee, for the appellant, Tareaun D. Griffin.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The convictions and sentences at issue in this appeal stem from a December 2002 armed robbery of a discount tobacco store in Nashville. Both Defendants accosted a store clerk with handguns and robbed him of the money in the store cash registers and several cartons of cigarettes. Upon exiting the store, Defendant Griffin fired several shots at the store clerk, hitting him once in the arm. Before he was transported to the hospital, the store clerk was able to give the police a description of his assailants, and the two Defendants were apprehended only a few hours after the robbery. Ultimately, Defendant Griffin was indicted on two charges in connection with the December 2002 robbery and shooting: especially aggravated robbery and attempted first degree murder.[1] At trial, Defendant Jenkins faced the single offense of especially aggravated robbery.[2]

At a pre-trial hearing conducted in June of 2004, the trial court heard the testimony of an expert witness, which Defendant Jenkins wished to introduce at trial. The court ruled that the expert testimony concerning Defendant Jenkins' diminished mental capacity did not relate to the culpable mental state elements of the offense with which he was charged. Accordingly, the trial court found the expert's testimony failed to meet the general relevancy standards for admissible evidence and denied Defendant Jenkins' request to admit the testimony of the expert witness at trial.

Defendants Griffin and Jenkins were tried jointly in November of 2004. At this trial, Hashem Al-Zayadi, the victim, testified that he was the owner of the In and Out Discount Tobacco store in Nashville at the time of the robbery. Mr. Al-Zayadi was working at his store the evening of December 11, 2002, when he saw Defendant Jenkins enter his store, look around, and then leave two or three minutes later. A half-hour later, Defendant Jenkins returned along with Defendant Griffin. Mr. Al-Zayadi left his counter, walked out to the sales floor and offered to assist the two men. The Defendants declined assistance, stating they were "just looking." Mr. Al-Zayadi described what happened next as follows: "The time I turn my back to try and go back to the cash register, all I see, both of them, they pull a gun." Mr. Al-Zayadi testified that one of the Defendants held a gun to his back and the other held a gun to his head while they forced him back to the store's two cash registers, where they both demanded he open them. After complying, Defendant Jenkins took the money from

---

[1]Defendant Griffin was initially charged in a twenty-two count indictment handed down by a Davidson County grand jury in January of 2003. A superceding twenty-three count indictment against Defendant Griffin and Defendant Jenkins was issued in June of 2003, of which counts one and two, charging especially aggravated robbery and attempted first degree murder, pertained to the December 2002 robbery. In February of 2004, Defendant Griffin's motion for a severance was granted and, accordingly, at trial he faced only the first two charges contained in the June 2003 indictment.

[2]Defendant Jenkins was initially indicted on twelve separate charges by a Davidson County grand jury in June of 2003. Of these charges, the first two, especially aggravated robbery and attempted first degree murder, pertained to the December 2002 robbery. In April of 2004, Defendant Jenkins' motion to sever was granted, leaving the first two charges of the June 2003 indictment. Just before trial in November of 2004, the trial court dismissed count two, and Defendant Jenkins proceeded to trial on the single charge of especially aggravated robbery.

the first register, and Defendant Griffin took money from the second. Defendant Jenkins then demanded Newport cigarettes and took several cartons.

Mr. Al-Zayadi explained that after obtaining the money and cigarettes, the two robbers started to leave, but Defendant Griffin returned and forced him to open the second cash register again to check under the tray for more money. Defendant Griffin took the additional money, but as he did, he observed Mr. Al-Zayadi press the button for the silent alarm. Mr. Al-Zayadi testified that at this point Defendant Griffin shot at him, the bullet passing by his head. Mr. Al-Zayadi then grabbed a handgun he kept under his sales counter, but as he did Defendant Griffin fired again, this time hitting him in the arm and causing the one shot Mr. Al-Zayadi fired in the altercation to go into the ceiling. Mr. Al-Zayadi stated that after being shot he fell to the floor, and Defendant Griffin shot at him several more times, just missing him.

As the robbers ran away, Mr. Al-Zayadi walked outside and observed the get-away vehicle, which he described as a red Nissan Maxima with tinted windows and no tags. A bystander saw the injured victim and called 911. The police arrived in less than five minutes. Mr. Al-Zayadi gave the police a description of the robbers before being transported to Vanderbilt Hospital. Mr. Al-Zayadi further testified that the same night, while he was still at the hospital, the police came to his room and asked him to look at two individuals. Mr. Al-Zayadi stated that he identified both men at this police show-up as his assailants, and there was no uncertainty in his identification.

On cross-examination, Mr. Al-Zayadi stated that he was only four to five feet from Defendant Griffin when Griffin fired the first shot. He further stated that he found two more bullets in his store a month after the police had completed processing the crime scene. Mr. Al-Zayadi also admitted that Defendant Jenkins had already left the store when the shooting started.

Officer Donald Barnes of the Nashville Police Department testified that on the night of the robbery he received a call from dispatch at 8:08 p.m. and arrived at Mr. Al-Zayadi's store within five minutes of receiving the call. Upon arriving at the crime scene, the victim informed Officer Barnes that he had been robbed and shot. Officer Barnes observed shell casings and projectiles at the scene. Officer Barnes reported the information he received from the victim to the dispatcher, who issued a police Be On the Look-Out (BOLO) for a dark car, possibly a Nissan Maxima, with a temporary tag and occupied by one white man and one heavy-set black man.

Officer Vincent Archuleta of the Nashville Police Department testified that on the night of the robbery he was in his patrol car when he heard the BOLO and decided to stake-out I-440, which he believed might be a possible escape route for the robbers considering the location of the crime. After waiting for twenty to twenty-five minutes, Officer Archuleta observed a vehicle matching the general description in the BOLO. After calling in his discovery and receiving back-up assistance, Officer Archuleta initiated a traffic stop and took two suspects into custody. Officer Archuleta also stated that he observed, in plain view, two handguns on the floorboard of the car, several cartons of cigarettes, and a significant amount of cash. After taking the two suspects into custody, Officer

Archuleta and a fellow officer transported them to Vanderbilt Hospital, where the suspects were turned over to detectives with the Robbery Division.

Detective Norris Tarkington of the Nashville Police Department Robbery Division testified that he spoke with the victim at the hospital and he appeared to be alert and coherent. Det. Tarkington stated that because it had been only a few hours since the crime, he conducted a show-up identification line-up by bringing the two suspects before the victim one at a time. Det. Tarkington stated that the victim had no hesitation in identifying the two Defendants as his assailants. Det. Tarkington also testified that when he spoke with Defendant Griffin the night of the robbery, Griffin told him that he, and not the store clerk, fired the first shot.

By stipulation, evidence was entered into the record that Officer Earl Hunter, a former crime scene investigator with the Nashville police, took photos of the crime scene and recovered latent fingerprints, two 9mm shell casings, a .25 caliber handgun, one .25 caliber shell casing and three projectiles.[3] Sergeant Danny Orr testified that he processed the car in which the Defendants were apprehended and recovered two handguns, four cartons of Newport cigarettes, and $680 in cash. Officer Michael Pyburn of the Nashville Police Department, certified by the trial court as an expert in firearm and tool mark identification, testified that the .380 caliber handgun recovered from the car was non-functional due to a missing firing pin and spring. However, the 9mm handgun recovered from the Defendants' vehicle and the .25 caliber handgun recovered at the crime scene were functional. Officer Pyburn further testified that it was his opinion, based on the tool marks, that the 9mm shell casing recovered at the crime scene was fired from the 9mm handgun recovered in the Defendants' car, and two of the projectiles recovered at the crime scene were also fired from this same gun. Officer Pyburn also testified that the .25 caliber shell casing and one projectile from the crime scene were fired by the .25 caliber handgun recovered at the scene.[4]

Officer Sally Sherman, an Identity Analyst with the Nashville Police Department, was certified by the court as an expert in latent fingerprint identification. Ms. Sherman testified that the fingerprints recovered at the crime scene matched those of Defendant Jenkins.

Defendant Griffin testified at trial and admitted that he and Defendant Jenkins were at the store the night in question. He further testified that "we went there to rob the man." Defendant Griffin further stated that he was armed with a 9mm handgun, first stating that he had two shells, and later admitting he actually fired more than two shots. Defendant Griffin stated that he saw Mr. Al-Zayadi push the silent alarm button and said aloud that they "better leave." Then, according to Defendant Griffin, "[b]y the time I got to the door, I heard a shot and I knew the manager had a gun so I pulled my gun out and ducked my head and ran out of the store with the gun in hand." Defendant Griffin further explained: "I had ducked down real low and was running because I didn't

---

[3]The notice of stipulation reflects that Officer Hunter was retired and in poor health at the time of the trial.

[4]While not explicitly stated, it is evident from the record that the .25 caliber handgun recovered at the crime scene is the weapon the victim, Mr. Al-Zayadi, kept under his sales counter and fired during his altercation with Defendant Griffin.

want to get hit. I just wanted to -- I didn't want to hurt him. I just wanted for him to be scared so he would leave us alone." Defendant Griffin also testified that he never intended to shoot anyone, and that he had already holstered his weapon when the store clerk began to shoot at him.

On cross-examination, Defendant Griffin again insisted that the store clerk "shot first." He also admitted that when he talked to detectives the night of the robbery, he lied and said he did not shoot the victim. Additionally, when specifically asked if he abandoned the robbery, Defendant Griffin answered, "No, sir."

Defendant Jenkins did not testify at trial.

Upon conclusion of the trial, Defendant Griffin was convicted of especially aggravated robbery and attempted second degree murder. Defendant Jenkins was convicted of especially aggravated robbery. In January of 2005, the trial court conducted a joint sentencing hearing. At this hearing, Defendant Griffin's mother, Ms. Catreda Norman, testified that her son's father died when Griffin was young, and that he received psychiatric care when he was a child but was never violent. Defendant Griffin testified that he "made some mistakes" because he was "hanging around with the wrong crowd." He also stated that he wished to apologize to the victim, and again declared that he only shot out of fear. On cross examination, Defendant Griffin admitted he was guilty of committing a number of robberies, assaults and burglaries to which he confessed when he was talking to detectives the night of his arrest.

Defendant Jenkins' mother, Ms. Roxanna Jenkins-Brevezinski, testified that Defendant Jenkins had a "tortured, tormented, very hard" childhood; that he was physically, emotionally and sexually abused by his father, beginning at age two; and that he had behavior problems as a child and was violent as a teenager. Counsel for Defendant Jenkins also submitted into the record extensive documentation of the Defendant's troubled juvenile years, including documents from various counselors and psychiatric care providers as well as Department of Children's Services' records.

Dr. James Walker, Assistant Professor of Psychiatry, Neurology and Psychology at Vanderbilt Medical Center, was certified by the court as an expert in his field an offered his professional opinion concerning Defendant Jenkins' mental state. Dr. Walker concluded, based on his interviews and tests, that Defendant Jenkins "had the greatest difficulty on tests relating to his social understanding, his understanding of why people do the things that they do or why they act the way they do, why we have rules and laws, how a person should behave. He scored very poorly on those sorts of tests." Additionally, concerning the crimes with which the Defendant was charged, Dr. Walker testified that Defendant Jenkins "did not have the typical appreciation that you would expect a 17 year old to have of those charges. He didn't realize the gravity and seriousness of them." As to intellectual capacity, Dr. Walked concluded that the Defendant "would be near borderline retarded," and his emotional function was similar to that of preschool age children.

At the conclusion of the sentencing hearing, the trial court sentenced Defendant Griffin to twenty years for his Class A felony especially aggravated robbery conviction and eleven years for

his Class B felony attempted second degree murder conviction, with service to be consecutive for an effective thirty-one year sentence. Defendant Jenkins was sentenced to twenty years for his Class A felony especially aggravated robbery conviction. Each defendant filed a motion for a new trial. Following separate evidentiary hearings, the trial court denied the motions for a new trial. Each Defendant timely filed a notice of appeal.

## ANALYSIS

On appeal, Defendant Griffin argues that the trial court erred when it failed to charge the jury with instructions on self-defense. Defendant Jenkins argues that the trial court violated his rights to due process by excluding from evidence expert testimony on the issue of diminished capacity. Both Defendants raise sentencing issues: Defendant Griffin challenges consecutive sentencing, and Defendant Jenkins argues the court erred by failing to sentence him as a mitigated offender. We find the claims of both Defendants unpersuasive and affirm the judgments of the trial court.

### I. Defendant Griffin's Claim of Failure to Instruct the Jury on Self-Defense

In Defendant Griffin's first issue on appeal, he argues that the trial court erred in ruling that, because he had not abandoned the robbery when he shot the victim, he was therefore not entitled to jury instructions on self-defense. To support his argument, Defendant Griffin cites to an 1884 case in which our supreme court stated that when the proof tends to show self-defense it is error to fail to give the instruction. See Souey v. State, 81 Tenn. 472 (Tenn. 1884). Defendant Griffin argues that the robbery was over when he fired his weapon in self-defense, and further asserts that the question of whether the facts supported his claim of self-defense was an issue for the jury, and not the trial court, to decide, citing State v. Ivy, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993) ("In determining whether evidence fairly raises an issue, trial courts must assess the defendant's position without ascertaining its truthfulness or the weight to which it might be entitled."). The State argues that Defendant Griffin clearly provoked the victim to use force by robbing him at gunpoint; that Griffin failed to present any evidence that he either abandoned the robbery or communicated intent to do so before he shot the victim; and therefore Defendant Griffin failed to meet the statutory requirements for raising the defense of self-defense.

The defense of self-defense is expressly provided for in Tennessee by statute and is defined, in relevant part, as follows:

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.
>  . . . .

(d) The threat or use of force against another is not justified if the person provoked the other individual's use or attempted use of unlawful force, unless:

(1) The person abandons the encounter or clearly communicates to the other the intent to do so; and

(2) The other nevertheless continues or attempts to use unlawful force against the person.

Tenn. Code Ann. § 39-11-611(a) and (d).[5]

A trial court has the duty to "give a complete charge of the law applicable to the facts of the case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). This duty includes "giving jury instructions concerning fundamental issues to the defense and essential to a fair trial . . . ." State v. Anderson, 958 S.W.2d 9, 17 (Tenn. Crim. App. 1998). See also Myers v. State, 206 S.W.2d 30, 32 (Tenn. 1947) (holding that a defendant is entitled to an affirmative instruction on self-defense if raised by the evidence). In deciding whether a defense instruction is warranted, the trial court "must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001).

Moreover, Defendant Griffin is correct in his assertion that when evidence supporting self-defense is admitted at trial, the question of whether or not an individual acted in self-defense is a factual determination to be made by the jury. See Ivy, 868 S.W.2d at 727. However, our law also mandates that "[t]he issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c). Additionally, this Court is instructed to interpret the above statute to read that "[t]he defendant has the burden of introducing admissible evidence that a defense is applicable." Id., Sentencing Commission Comments. See also State v. Leaphart, 673 S.W.2d 870, 873 (Tenn. Crim. App. 1983) (holding "[a]lthough it is well-settled that an accused is entitled to an affirmative instruction on every issue fairly raised by the evidence, there is no requirement that the court charge on matters not raised by the proof."). Thus, this Court may find error only if a jury charge "fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

---

[5]Subsection (d) of the self-defense statute is a codification of the long accepted legal principle known as the initial aggressor rule, which has been explained by this court as follows:

> The law of Tennessee is that an aggressor, who produces fear or apprehension of death or great bodily harm in the mind of his adversary, cannot lawfully defend his life against the deadly defensive act of his adversary by taking the latter's life, until he has restored his right of self-defense, lost by his initial fault, by abandoning and withdrawing from the contest and giving notice of the fact to the adversary. The aggressor's act is unlawful and felonious, and his adversary's act lawful and necessary, and the former, as the guilty party, must bear all unavoidable consequences flowing from his wrongful act.

Gann v. State, 383 S.W.2d 32, 36 (Tenn. 1964), superceded by statute as stated in State v. William, 38 S.W.3d 532 (Tenn. 2001).

In this case, it is undisputed that Defendant Griffin was the initial aggressor who "provoked" the victim's attempted use of force. Self-defense is generally not an available defense when a defendant provokes the initial use of force. See State v. Inlow, 52 S.W.3d 101, 109 (Tenn. Crim. App. 2000). Therefore, under these factual circumstances, Defendant Griffin is only entitled to claim that self-defense is "fairly raised by the evidence" if there is evidence that he "abandon[ed] the encounter or clearly communicate[d] to the other the intent to do so." Tenn. Code Ann. § 39-11-611(d)(1). The trial court declined to charge the jury with instructions on self-defense because it concluded there was no evidence that Defendant Griffin abandoned the armed robbery. We agree.

Even considering the evidence in the light most favorable to Defendant Griffin, we cannot conclude that the evidence contained in the record raised a factual issue of self-defense. The victim testified that Defendant Griffin was only four or five feet from him when Griffin fired the first shot, and that after Defendant Griffin's second shot hit him, he fell to the floor behind the counter while Defendant Griffin continued to shoot at him. Defendant Griffin claims the robbery was over and he was exiting when the victim fired first and he was forced to fire his weapon in self-defense. However, the evidence presented in the record places Defendant Griffin not outside the store or even by the door, but rather well within the store, only four or five feet from the sales counter where he robbed the victim when he first began shooting. Nothing in the record suggests Defendant Griffin abandoned the robbery or communicated his intent to do so. See Tenn Code Ann. § 39-11-611(d)(1). Additionally, when asked at trial if he abandoned the robbery, the Defendant replied in the negative. There is simply no objective basis for this Court to find that Defendant Griffin was either "free from fault in bringing about the necessity of using force or . . . [had] clearly abandoned his initial intent to do harm." State v. Thacker, 164 S.W.3d 208, 245 (Tenn. 2005). Accordingly, we conclude the trial court's refusal to instruct the jury on self-defense was not error. This issue is without merit.

## II. Defendant Jenkins' Claim of Error in Excluding Expert Testimony

Defendant Jenkins raises as his first issue on appeal the claim that the trial court erred in excluding from evidence the testimony of an expert in psychiatry, psychology and neurology who would have rendered an opinion concerning his diminished mental capacity. To support this claim, Defendant Jenkins argues that the jury should have ben able to hear evidence of his low intellectual ability and impaired "social intelligence." Defendant Jenkins asserts that the expert's opinion on his diminished capacity is "relevant" evidence, citing State v. Hall, 958 S.W.2d 679 (Tenn. 1997), and that the trial court erred when it excluded the evidence because it found no "link" between the expert's testimony and the Defendant's ability to form the requisite mental state element of the crime for which he was charged. Because, Defendant Jenkins argues, the trial court's ruling denied him his right to present a defense of diminished capacity to the jury, his due process rights and right to a jury trial were violated. The State argues the expert testimony was properly excluded as irrelevant because the testimony failed to show the Defendant's mental defects rendered him unable to act intentionally or knowingly.[6]

---

[6]Defendant Jenkins was charged with and convicted of especially aggravated robbery, which carries the mens rea element of "intentional or knowing" theft of property from a person by violence or fear, accomplished with a deadly

(continued...)

In Tennessee, the "qualifications, admissibility, <u>relevancy</u> and competency of expert testimony are matters which largely rest within the sound discretion of the trial court." <u>State v. Ballard</u>, 855 S.W.2d 557, 562 (Tenn. 1993) (emphasis added). While such discretion is not absolute, this Court will overturn a trial court's ruling on such issues only when "the discretion is arbitrarily exercised." <u>Id.</u>

Our supreme court has noted that "[i]n modern application, diminished capacity is not considered a justification for a crime, but rather an attempt to prove the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime . . . ." <u>Hall</u>, 958 S.W.2d at 688. Thus, unlike self-defense, alleging diminished capacity is not a defense to a crime. Our highest court clarified: "In other words, 'diminished capacity' is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state. 'Properly understood, it is . . . not a defense at all but merely a rule of evidence.'" <u>Id.</u> at 688-89 (citing <u>United States v. Pohlot</u>, 827 F.2d 889, 897 (3rd Cir. 1987)).

Under Tennessee law, relevant evidence is generally admissible unless its probative value is substantially outweighed by its prejudicial effect. <u>See</u> Tenn. R. Evid. 402 and 403. Evidence is "relevant" if it tends to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Thus, "evidence which tends to prove or disprove the required mental state is relevant and generally admissible under Tennessee law." <u>Hall</u>, 958 S.W.2d at 689. However, in addition to the general relevance rules, expert testimony in Tennessee must also "substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Tenn. R. Evid. 702. Accordingly, the Tennessee Supreme Court has mandated that "to gain admissibility, expert testimony regarding a defendant's incapacity to form the required mental state must satisfy the general relevancy standards as well as the evidentiary rules which specifically govern expert testimony." <u>Hall</u>, 958 S.W.2d at 689.

The Tennessee Supreme Court recently upheld <u>State v. Hall</u> as the controlling case law when reviewing a trial court's decision to deny expert testimony regarding diminished capacity. In <u>State v. Faulkner</u>, 154 S.W.3d 48, 56-57 (Tenn. 2005), our high court outlined the standard this Court must apply as follows:

> In [State v.] <u>Hall</u> [958 S.W.2d 679 (Tenn. 1997)], the Court held that if general relevancy standards and evidentiary rules are satisfied, "psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law." <u>Id.</u> at 689 (emphasis added). The Court cautioned against referring to such evidence as proof of "diminished capacity." <u>Id.</u> at 690. Instead, such evidence should be presented as relevant to negate the existence of the culpable

[6](...continued)

weapon, and where the victim suffers serious bodily injury. <u>See</u> Tenn. Code Ann. §§ 39-13-401(a), -403(a).

mental state. The Court distinguished "mental disease or defect" from "emotional state or mental condition":

> [W]e emphasize that the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of lack of <u>capacity</u> to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue.

<u>Id.</u> at 690 (emphasis in original).

In this case, during a pretrial hearing, the trial court heard the expert testimony of Dr. Walker concerning diminished capacity which Defendant Jenkins sought to introduce during the guilt phase of his trial. The trial court ruled that Dr. Walker's expert testimony was inadmissable at the guilt phase of he trial under <u>Hall</u> because the Defendant's expert could not testify that Defendant Jenkins was incapable of acting intentionally or knowingly due to a mental disease or defect. We aggree with the trial court.

We note that Dr. Walker testified at length during the sentencing hearing as to the diminished intellectual, emotional and social aspects of Defendant Jenkins' mental capacity but was unable to offer testimony that Defendant Jenkins lacked the capacity to form the requisite mental state of acting intentinally or knowingly because of a mental disease or defect. Thus, Dr. Walker's expert testimony did not meet the prerequisites, as established by <u>Hall</u>, of relevant evidence of diminished capacity. Accordingly, we conclude that the tral court did not err in excluding the testimony of Dr. Walker from the guilt phase of the trial. This issue is without merit.

## III. Sentencing

Both Defendants raise sentencing issues on appeal. Defendant Griffin claims that the trial court erred by ordering him to serve his two sentences consecutively. Defendant Jenkins asserts that the trial court erred when it failed to apply the appropriate weight to several mitigation factors. We disagree.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. <u>See</u> Tenn. Code Ann. § 40-35-210(b); <u>State v. Imfeld</u>, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the

-10-

method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W. 2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act, and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401 Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.[7]

## A. Defendant Griffin's Claim of Improper Consecutive Sentencing

Defendant Griffin claims that the trial court erred in imposing consecutive sentences because it erroneously found him to be a "dangerous offender." To support this argument, Defendant Griffin argues that he was "improperly denied the charge of self-defense" which "result[ed] in his conviction" for attempted second degree murder. Thus, Defendant Griffin argues, "had the jury found he fired in self-defense the remaining facts relied upon by the Trial Court would be insufficient to find him to be a dangerous offender thereby resulting in consecutive sentences." Defendant Griffin's argument fails because, 1) as stated above, the trial court correctly denied jury instructions on self-defense, 2) the trial court properly concluded the Defendant was a dangerous offender, and 3) the court imposed consecutive sentences based on an additional factor.

We begin our analysis by noting that it is within the sound discretion of the trial court whether to impose consecutive or concurrent sentences. See State v. James, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). Tennessee courts may order consecutive sentences in cases in which at least one of seven statutorily enumerated criteria is found to be applicable "by a preponderance of the evidence." Tenn. Code Ann. § 40-35-115(b). In addition to these criteria, consecutive sentencing is also subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed," that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and that the

---

[7]We note that the legislature has recently amended several provisions of the Criminal Sentencing Reform Act of 1989, said changes becoming effective June 7, 2005. However, the Defendants' crimes in this case, as well as their sentencing, predate the effective date of these amendments. Therefore, this case is not affected by the 2005 amendments, and the statutes cited in this opinion are those that were in effect at the time the instant crimes were committed.

defendant's "potential for rehabilitation" be considered. Tenn. Code Ann. § 40-35-103(2), (4) and (5). Additionally, we are advised that "the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved." Tenn. Code Ann. § 40-35-115 Sentencing Commission Comments.

In the case at hand, the trial court found two consecutive sentencing criteria applied: the Defendant was "an offender whose record of criminal activity is extensive," and "is a dangerous offender whose behavior indicates little regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(2) and (4). As to the Defendant's extensive criminal history, the trial court recited at the sentencing hearing no less than seventeen crimes, mostly robberies, which Defendant Griffin admitted committing. The trial court concluded that Defendant Griffin is "an offender with a record of extensive criminal activity, but most importantly he is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime to which the risk to human life is high."

We find the record contains sufficient evidence of the Defendant's extensive prior criminal history to support the court's imposition of consecutive sentences based on an "extensive" criminal record. See Tenn. Code Ann. § 40-35-115(b)(2). The record contains evidence that Defendant Griffin was responsible for robbing taco stands, taxi drivers, pizza delivery men and fast food restaurants. The Defendant also admitted to robbing and assaulting various individuals, shooting into a car, and using illegal drugs. The Defendant's effective sentence of thirty-one years is the result of his pattern of continued criminal activity, and consecutive sentencing would be warranted on this factor alone.

The trial court also found that Defendant Griffin was a "dangerous offender." Tenn. Code Ann. § 40-35-115(b)(4). Our supreme court has held that when relying on the "dangerous offender" factor for imposition of consecutive sentencing, a trial court must also find that "the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). In this case, the trial court made specific findings that a "31-year sentence is appropriate and it reasonably relates to the severity of the offense." The court noted that "[w]e are all very lucky that the victim did not get killed." The court also found that, considering both the Defendant's crimes at issue in this case as well as his extensive record of other violent crimes, "society needs to be protected from Mr. Griffin."

We conclude that the evidence contained in the record on appeal supports the trial court's ruling. The record before us leads us to conclude that Defendant Griffin's crimes are becoming increasingly more dangerous. Because the general public deserves protection from the Defendant, a lengthy sentence is warranted. Accordingly, we conclude the trial court properly imposed consecutive sentencing. This issue is without merit.

**B. Defendant Jenkins' Claim of Error for Failure to Mitigate His Sentence.**

In his final issue on appeal, Defendant Jenkins claims the trial court erred when "after it found the Defendant / Appellant was a mitigated offender it failed to assign any weight to that finding and failed to sentence the Defendant / Appellant as a mitigated offender." In support of this claim, Defendant Jenkins argues that the trial court improperly "used evidence which did not consist of an aggravating factor to cancel out mitigating factors." Thus, Defendant Jenkins argues, he was entitled to a mitigated sentence of thirteen and one-half years.[8]

In Defendant Jenkins' case, the trial court found no applicable enhancement factors. However, the trial court found that because of the Defendant's "youth and mental defect [he] lack[ed] substantial judgment in committing the offence," seemingly a finding that mitigation factor(s) were applicable. See Tenn. Code Ann. 40-35-113(6) and (13). Nonetheless, the court came to the following conclusion: "Even though I am going to find the mitigation exists, I am not going to give it any weight because clearly his behavior sort of counter balances all of that."

The weight afforded to a mitigation factor is a matter entrusted to the discretion of the trial court. See State v. Gray, 960 S.W.2d 598, 610 (Tenn. Crim. App. 1997). Furthermore, according to the Sentencing Act, when a trial court finds the presence of a mitigating factor but no enhancement factors, the sentence imposed for a Class A felony should be set "at or below the midpoint" in the range. See Tenn. Code Ann. § 40-35-210(d). In this case, Defendant Jenkins was sentenced to twenty years--the mid point for his range. See Tenn. Code Ann. § 40-35-112. Accordingly, we conclude the trial court did not abuse its discretion in sentencing Defendant Jenkins to a twenty-year sentence. This issue is without merit.

## CONCLUSION

Based of the foregoing reasoning and authorities, the judgments of the trial court are affirmed as to both Defendants.

_____
DAVID H. WELLES, JUDGE

---

[8]The State posits that Defendant Jenkins also claims on appeal that the trial court erred by failing to sentence him as a mitigated offender pursuant to Tennessee Code Annotated section 40-35-109. However, while agreeing that the Defendant's sentencing issue could be phrased more clearly, we conclude the only issue raised in the Defendant's appellate brief pertains to the weight the court assigned to mitigation factors pursuant to Tennessee Code Annotated section 40-35-113.